UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

JERRY ALEXANDER MENCHU,                        Case No. 3:20-cv-00559-AR

                      Plaintiff,                **FINDINGS AND
                                                        RECOMMENDATION**

    v.

MULTNOMAH COUNTY HEALTH
DEPARTMENT,

                      Defendant.

_____

**ARMISTEAD, Magistrate Judge**

      Plaintiff Jerry Menchu, representing himself, brings this lawsuit against his employer, the

Multnomah County Health Department. Menchu is Mayan, Guatemalan, and of Hispanic

ethnicity. His first language is Spanish, and he speaks English with a Spanish accent. (First Am.

Compl. ¶¶ 12-13, ECF No. 20.)

      Menchu began working as an on-call Spanish interpreter for the Department in 2013. He

remains on-call as an interpreter, although he has not performed any work for the Department

Page 1 – FINDINGS AND RECOMMENDATION

since 2020. Menchu alleges that, during his employment, the Department discriminated against him based on his race and national origin by classifying him as a temporary on-call employee and treating him differently from regular, fulltime employees: he brings claims for disparate treatment based on race or national origin, in violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000e, *et seq.*), Oregon's statutory parallel (ORS §§ 659A.001, *et seq.*), and the Civil Rights Act of 1866 (codified at 42 U.S.C. § 1981) (Claim 1). Menchu also alleges that the Department retaliated against him for complaints he made in 2018 and 2019, in violation of federal law—specifically 42 U.S.C. § 1981 and Title VII (Claim 2), and in violation of Oregon Revised Statutes §§ 659A.030(1)(f), 659A.199, and 659A.203 (Claim 3). Finally, Menchu alleges that the Department violated Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d) by using federal funds for a discriminatory purpose (Claim 4). (Compl. ¶¶ 49-78.)

The Department moves for summary judgment on each of Menchu's claims. It argues that Menchu's claims are untimely, that the conduct Menchu alleges does not constitute adverse employment actions, that there is no evidence of discriminatory or retaliatory intent, and that the Department had legitimate, nondiscriminatory reasons for the actions it took. (Def.'s Mot. at 2, ECF No. 80.)

The court agrees that Menchu cannot show that discriminatory or retaliatory intent motivated any adverse employment actions against him. Accordingly, the Department's motion for summary judgment should be granted.

\ \ \ \ \

\ \ \ \ \

\ \ \ \ \

Page 2 – FINDINGS AND RECOMMENDATION

## BACKGROUND

The following facts are undisputed. The Multnomah County Health Department employed Menchu as an on-call interpreter from 2013 through 2020[1] to interpret between Spanish and English for clinic patients. The Department has seven clinics throughout Multnomah County. (Mora Decl. ¶ 4, ECF No. 82.) As an on-call interpreter, Menchu was not an employee of any specific clinic. Instead, he worked across multiple clinics, and could be scheduled to interpret at more than one clinic in a single day. (*Id.* ¶¶ 12, 16; Menchu Dep. at 60:15-20, ECF No. 89-1 at 1282-1344.) As an on-call employee, Menchu did not have a set schedule and his hours and number of assignments varied from day to day and week to week. (Mora Decl. ¶ 12; Hazeem Dep. at 11:19–13:11, ECF No. 100 at 66-74; *see also* Bannon Moore Decl. Ex. 1, ECF No. 81.) Typically, on-call employees at the Department are expected to work no more than 20 hours per week. (Mora Decl. ¶ 13; Menchu Dep. at 231:20–232:22; D'Agostini Dep. at 30:14-18, ECF No. 100 at 77-88.) But Menchu consistently worked more than 20 hours per week, often exceeding 40 hours per week, between 2016 and early 2020. (*See* Bannon Moore Decl. Ex. 1.)

On-call interpreters' appointments were scheduled through Language Services. Language Services would receive a notification when a patient requested an interpreter. Sometimes, a patient indicated a preferred interpreter, in which case Language Services would schedule that interpreter for the appointment, if available. (Hazeem Dep. at 8:06-17, 21:22-25.) Interpreters could also pick up appointments if they were present in a clinic when the clinic needed an

---

[1]     Menchu remains an on-call interpreter for the Department, but has not been scheduled to work any hours since April 2020, when the Department switched to using outside vendors to provide interpreters. (Mora Decl. ¶¶ 6, 9; Menchu Dep. 242:23-243:20.) Menchu does not allege that the Department either discriminated or retaliated against him by switching to vendors in April 2020. (*See* Compl. ¶¶ 12-48.)

interpreter. (Mora Decl. ¶ 13; *see also* Bannon Moore Decl. Ex. 5 at 72.) Employees of the individual clinics did not know in advance when a given interpreter would be present in a clinic. (Mora Decl. ¶ 17.)  On-call interpreters did not have badge access in the clinics where they worked. Instead, they had to check in with the clinic's front desk when they arrived at each clinic, and were then allowed into non-public areas of the clinic. (*Id.* ¶ 16; Menchu Dep. at 79:02–80:03.)

Each clinic has its own budget that is billed when it uses on-call interpreters. (Mora Decl. ¶ 8.) From 2013 to 2020, the Department used both on-call employee interpreters (like Menchu) and outside vendors to interpret in the clinics. (*Id.* ¶ 6.) In April 2020, because of the COVID-19 pandemic, the Department stopped in-person interpretation and began exclusively scheduling vendors, who were already interpreting over the phone. (*Id.* ¶ 9.) The Department continues to use vendors exclusively. (*Id.* ¶ 10.) Using vendors makes scheduling easier because the vendors manage requests and ensure available interpreters. The Department also uses Oregon Health Plan (OHP) preferred vendors, which ensures that the Department does not have to pay for interpretation for OHP-insured patients. (*Id.* ¶ 8.)

A.    ***Menchu's Complaints and Responses***

In August 2015, Menchu filed a report with Multnomah County's Office of Equity and Inclusion, asserting that clinic staff had not allowed a different interpreter into the back office to fax her timesheet, telling both Menchu and the other interpreter that they could not come into the non-public areas of the clinic without an escort. (Bannon Moore Decl. Ex. 3 at 3-5.) Menchu complained that the conduct was discriminatory. (*See id.*) The next month, a supervisor emailed clinic staff that they should let on-call interpreters into the back office to fax their timesheets,

and that interpreters did not need escorts. The email also instructed that interpreters "should not linger or visit with staff." (ECF No. 89-1 at 324.) After that, Menchu did not have any issues accessing the fax machine. (Menchu Dep. at 128:20-24.)

In May 2016, Menchu filed a report with the County, noting that he had been asked to make reminder calls to patients on his personal phone after he was clocked out. Menchu reported that he believed the practice violated HIPAA. In September, a County attorney responded that Menchu and other interpreters would be asked only to make calls during work hours and from a County office. (Bannon Moore Decl. Ex. 4 at 1.)

In April 2017, Menchu and other interpreters filed a complaint with the Oregon Health Authority (OHA), alleging that the Department was violating Title VI, state law, and Section 1557 of the Patient Protection and Affordable Care Act by using multilingual staff to interpret for patients. Soon after, Menchu filed a substantially similar complaint with the United States Department of Health and Human Services. (Bannon Moore Decl. Ex. 5 at 1-5, 14-16; Pl.'s Resp. at 54, ECF No. 89; ECF No. 89-1 at 1035.) The on-call interpreters pointed out that they were required to be qualified, and had obtained the necessary credentials to become qualified. (Bannon Moore Decl. Ex. 5 at 20.) In contrast, they said, multilingual staff were not qualified and should not be interpreting for patients. (*Id.* at 4-5.) Menchu sent another complaint to HHS in October 2019, and to the County and OHA in November 2019, about the use of multilingual staff. (*See* Bannon Moore Decl. Ex. 12 at 1; ECF No. 89-1 at 1090-94.) HHS investigated the matter and eventually determined that the Department was in compliance with Title VI and Section 1557. (Bannon Moore Decl. Ex. 12 at 2.)

In July 2018, Menchu began emailing Multnomah County's Human Resources (HR)

Page 5 – FINDINGS AND RECOMMENDATION

office about why he did not receive cost of living adjustments (COLAs) and other benefits, despite working a fulltime schedule. (ECF No. 89-1 at 936-37; Bannon Moore Decl. Ex 6 at 1.) Two HR employees met with Menchu that month and again in August. (ECF No. 89-1 at 837-38.) As a result of those meetings, HR requested the creation of a new classification for interpreters, which was approved in September 2018. (Murphy Decl. Ex. 1 at 4, ECF No. 83.) Effective October 3, 2018, all interpreters were moved to the new classification, which provided a pay raise from $18.04 to $20.48 per hour and eligibility for yearly COLAs. (*Id.* at 4-5.) The new classification allowed interpreters to be hired as fulltime regular employees, if any clinic had the need and budget for a fulltime interpreter. (*Id.* ¶ 5.) Based on the HR employees' statements to him during the August and September meetings, Menchu believed that he would soon be moved into a fulltime position with full benefits. (*See* ECF No. 89-1 at 946, 960.) But no clinic ever hired a fulltime interpreter and Menchu never received a fulltime position. (Murphy Decl. ¶ 5.)

In November 2018, Menchu filed an Unfair Labor Practice (ULP) complaint with the Oregon Employment Relations Board, asserting that the Department was discriminating against him by continuing to classify him as an on-call employee. (Bannon Moore Decl. Ex. 7 at 1, 16-17.) He argued that he should be classified as, and receive the benefits of, a regular fulltime employee. (*Id.* at 11-12.) Menchu withdrew his ULP complaint in August 2019. (Bannon Moore Decl. Ex. 11 at 1-2.)

In February 2019, Menchu filed a complaint with Oregon's Bureau of Labor and Industries (BOLI), alleging discrimination on the basis of age, race, and national origin. (Bannon Moore Decl. Ex. 8 at 1.) After obtaining counsel in April (*id.* at 8), he amended his BOLI

complaint in July to add claims for retaliation. (*Id.* at 4.) In April 2020, Menchu filed this lawsuit.

## SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A party seeking summary judgment bears the burden of establishing the absence of a genuine issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party demonstrates no issue of material fact exists, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324. A party cannot defeat a summary judgment motion by relying on the allegations set forth in the complaint, on unsupported conjecture, or on conclusory statements. *Hernandez v. Spacelabs Med., Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Summary judgment thus should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

In determining whether to grant summary judgment, the court must view the evidence in the light most favorable to the nonmoving party. *Curley v. City of N. Las Vegas*, 772 F.3d 629, 631 (9th Cir. 2014); *Hernandez*, 343 F.3d at 1112. All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). But deference to the nonmoving party has limits. The nonmoving party must set forth "specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e). The "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Chong v. STL Int'l, Inc.*, 152 F. Supp.

3d 1305, 1309 (D. Or. 2016). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks omitted).

## PRELIMINARY MATTERS

Before addressing the substance of Menchu's claims, the court resolves two preliminary arguments raised by the Department: that (1) much of Menchu's evidence must be excluded and (2) Menchu's claims are untimely as to most of the conduct alleged.

### A.    *Evidentiary Objections*

The court first addresses the Department's objections to Menchu's evidence. Menchu attached one document, containing 100 exhibits, to his Response to the Department's Motion. (ECF No. 89-1.) The Department objects to some of those exhibits, or portions of them, on the bases that those exhibits are irrelevant, are inadmissible, lack foundation, or reference events outside the statute of limitations. It also objects to any portions of the exhibits not cited in Menchu's briefs. (Def.'s Reply at 3, ECF No. 95.)

The Department's relevance objections are moot in the summary judgment context because they are "duplicative of the summary judgment standard itself." *Sandoval v. County of San Diego*, 985 F.3d 657, 665 (9th Cir. 2021) (quoting *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006)). "[I]f evidence submitted on summary judgment could create a genuine dispute of material fact, it is, by definition, 'of consequence in determining the action,' and therefore relevant." *Sandoval*, 985 F.3d at 665. As the Ninth Circuit has instructed, "parties briefing summary judgment motions would be better served to simply *argue* the import

of facts reflected in the evidence rather than expending time and resources compiling laundry lists of relevance objections." *Id.*

The Department's objections that exhibits are "Outside SOL" (ECF No. 96 at 3-20), which the court understands to mean outside the statute of limitations, are unavailing. First, as explained below, the court disagrees with some of the Department's assessment of the timeliness of Menchu's claims. Second, even if Menchu's evidence relates to conduct that occurred outside the statute of limitations (and thus cannot be used to extend liability) that evidence can still be used to show the Department's discriminatory intent. *Lyons v. England*, 307 F.3d 1092, 1110 (9th Cir. 2002). Finally, the Department's "Outside SOL" objections boil down to relevance objections. (*See* Def.'s Reply at 7 ("[M]ost of the evidence provided is irrelevant as it occurred outside the statute of limitations.") *id.* at 8 ("Again, the evidence provided by [Menchu] is irrelevant as it occurred outside the statute of limitations.").) As noted above, relevance objections are moot in the summary judgment context.

Regarding the Department's objection to any portion of the materials not cited in Menchu's Response, the court has discretion to consider portions of the record not cited in the briefs. FED. R. CIV. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."). The court declines to summarily strike all portions of Menchu's exhibits not cited in his brief.

Finally, the Department argues that many of Menchu's exhibits are inadmissible or lack foundation. Those objections are also denied as moot because consideration of the materials objected to does not alter the outcome on the Department's motion for summary judgment. *See, e.g.*, *Pullom v. U.S. Bakery*, 477 F. Supp. 2d 1093, 1109 (D. Or. 2007) (denying defendant's

motion to strike because "the court's consideration of material that [was] the subject of defendant's motion was not outcome determinative"); *Bona Fide Conglomerate, Inc. v. SourceAmerica*, Case No. 3:14-cv-00751-GPC-AGS, 2017 WL 3149578, at *6 (S.D. Cal. July 24, 2017) (stating that the court would address "only the salient objections" regarding party's evidence on motion for summary judgment).

## B.    *Timeliness of Menchu's Claims*

The court next addresses the Department's argument that the majority of Menchu's claims are untimely. The Oregon Tort Claims Act, ORS §§ 30.260 *et seq*., provides both notice requirements and statutes of limitations for parties seeking to file tort claims against Oregon public bodies. ORS § 30.275(2)(b) requires an injured party to give notice of any claim against an Oregon public body within 180 days of the alleged loss or injury. Accordingly, the Department argues, any claim for conduct occurring more than 180 days before the Department received Menchu's initial lawsuit on May 18, 2020, is time-barred. (Def.'s Mot. at 9.)

Menchu argues that there is an exception to the Oregon Tort Claims Act (OTCA) for discrimination claims. He points out that, under ORS § 659A.875(6)(c), an employment discrimination lawsuit again a public body must be commenced within five years of the alleged loss or injury. (Pl.'s Statement of Facts at 2, ECF No. 88.) That statute provides an exception to the statute of limitations described in ORS § 30.275(9), which ordinarily requires that actions against public bodies be filed within two years of the alleged loss or injury.

The Department's argument, however, is based in the OTCA's notice requirement, not its statute of limitations. Menchu's Oregon statutory claims are subject to *both* the notice requirement and the applicable statute of limitations. ORS § 30.275; ORS § 659.875; *see also*

*Shepard v. City of Portland*, 829 F. Supp. 2d 940, 957 (D. Or. 2011) (explaining that both the OTCA's notice requirement and the statute of limitations provided by ORS § 659A.875 applied to plaintiff's state-law discrimination and retaliation claims, concluding that "the OTCA notice provision acts as the ultimate time-bar with respect to plaintiff's claims").

Accordingly, to the extent that Menchu's Oregon statutory claims are based on discrete acts that occurred more than 180 days before May 18, 2020,[2] those claims are time-barred. *Lyons*, 307 F.3d at 1105-08.

But the OTCA's notice requirements do not apply to Menchu's federal claims. "Unlike the lack of statutes of limitations in the federal civil rights laws, the absence of any notice-of-claim provision is not a deficiency requiring the importation of such statutes into the federal civil rights scheme." *Felder v. Casey*, 487 U.S. 131, 134, 140 (1988) (holding that similar notice requirement in Wisconsin statute did not apply to § 1983 claim because it was "pre-empted as inconsistent with federal law"); *see also Baumgarner v. Cmty. Servs., Inc.*, 992 F. Supp. 2d 1081, 1091-95 (D. Or. 2014) (declining to apply notice provisions of the OTCA to plaintiff's Title VII claims, noting "the absence of any authority requiring individuals to comply with the notice provisions of the OTCA before bringing claims for violation of Title VII"); *Rogers v. Saylor*, 306 Or. 267, 278, 285 (1988) (holding that certain of OTCA's provisions did not apply to plaintiff's federal § 1983 claim). Menchu's federal claims are not time barred.

Having resolved those preliminary matters, the court turns to the Department's motion

---

[2]    The Department contends that it did not receive notice under ORS § 30.275 until May 18, 2020, when it received Menchu's initial lawsuit. (Def.'s Mot. at 9.) Menchu does not dispute that May 18, 2020 is the date that the Department received notice under ORS § 30.275. (*See* Pl.'s Statement of Facts; Pl.'s Resp.)

for summary judgment on Menchu's disparate treatment and retaliation claims.

## DISCUSSION

**A.     *Claims 1, 2, and 3: Disparate Treatment and Retaliation***

Menchu alleges numerous and overlapping factual bases for each of his claims. As to his disparate treatment claim (Claim 1), he alleges that the Department discriminated against him by denying him access to non-public clinic areas, excluding him from meetings, trainings, and social gatherings, assigning him extra duties and cancelling his appointments, publicly reprimanding him, classifying him as a temporary on-call employee, reducing his hours in 2017, and failing to hire him into a Health Assistant 1 position. (*See* Compl.; Pl.'s Resp.)

As to his retaliation claims (Claims 2 and 3), Menchu points to the Department failing to hire him into the Health Assistant 1 position, auditing his paycheck, reducing his hours in 2019, removing his name from appointments, denying him sick leave, and failing to hire him into a fulltime position. (*See* Compl.; Pl.'s Resp.)

To survive a motion for summary judgment on a disparate treatment or retaliation claim under Title VII, ORS § 659A.030, or § 1981, or a retaliation claim under ORS §§ 659A.199 or 659A.203, "a plaintiff must offer evidence that gives rise to an inference of unlawful discrimination, either through the framework set forth in *McDonnell Douglas Corp. v. Green* or with direct or circumstantial evidence of discriminatory intent." *Freyd v. Univ. of Or.*, 990 F.3d 1211, 1228 (9th Cir. 2021) (quotation marks omitted) (disparate treatment under Title VII); *Dawson v. Entek Int'l*, 630 F.3d 928, 934-35 (9th Cir. 2011) (same legal framework applies to claims under Title VII and ORS § 659A.030); *Surrell v. Cal. Water Svc. Co.*, 518 F.3d 1097, 105-06 (9th Cir. 2008) (same legal framework applies to disparate treatment and retaliation

claims under Title VII and § 1981); *Larmanger v. Kaiser Found. Health Plan of the Nw.*, 895 F. Supp. 2d 1033, 1049 (D. Or. 2012) (same legal framework applies to retaliation claims under Title VII and ORS §§ 659A.199 and 659A.203). Accordingly, the court analyzes all of Menchu's disparate treatment and retaliation claims (Claims 1, 2, and 3) together.

"Under either approach, staving off a motion for summary judgment . . . entails three steps." *Opara v. Yellen*, 57 F.4th 709, 721 (9th Cir. 2023). First, the plaintiff must establish his *prima facie* case of discrimination or retaliation. If the plaintiff does so, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the alleged discriminatory conduct. "The plaintiff may then offer evidence that the proffered nondiscriminatory reason is merely a pretext for discrimination." *Surrell*, 518 F.3d at 1105-06; *Opara*, 57 F.4th at 721-24.

### 1. *Prima Facie* Case

In the disparate treatment context, a plaintiff can raise an inference of discriminatory intent by showing (1) he belongs to a protected class; (2) he was qualified for the position and performing his job satisfactorily; (3) he was subject to an adverse employment action; and (4) similarly situated individuals outside his class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination. *Opara*, 57 F.4th at 722; *Hawn v. Exec. Jet. Mgmt.*, 615 F.3d 1151, 1155 (9th Cir. 2010). Alternatively, a plaintiff can simply produce "direct or circumstantial evidence of discriminatory motive to establish [his] *prima facie* case." *Opara*, 57 F.4th at 722 (italics added); *Surrell*, 518 F.3d at 1105.

In the retaliation context, a plaintiff makes his *prima facie* case by showing that (1) he engaged in a protected activity; (2) he was subject to an adverse employment action; and (3) there was a causal connection between the two. *Surrell*, 518 F.3d at 1108.

Common to both discrimination and retaliation claims is the requirement that the plaintiff allege that he was subject to an adverse employment action. "The Ninth Circuit defines adverse employment actions broadly." *Shepard v. City of Portland*, 829 F. Supp. 2d 940, 960 (D. Or. 2011). In the disparate treatment context, "an adverse employment action is one that materially affects the compensation, terms, conditions, or privileges of employment." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (simplified). That is, the employer's conduct must have an "adverse effect on the employee's work or status" to constitute an adverse employment action. *Schlosser v. Potter*, 248 F. App'x 812, 817 (9th Cir. 2007). In the retaliation context, the definition of adverse employment action is broader: it includes any action that is "reasonably likely to deter [an employee] from engaging in protected activity." *Coszalter v. City of Salem*, 320 F.3d 968, 976 (9th Cir. 2002).

> A variety of conduct has met these definitions, including: a lateral transfer, or refusing a lateral transfer; undeserved negative performance evaluations or job references if motivated by retaliatory animus and not promptly corrected; being excluded from meetings, seminars, and positions that would have made the employee more eligible for salary increases; being denied secretarial support; eliminating job responsibilities; and receiving a more burdensome work schedule. *Shepard*, 829 F. Supp. 2d at 960 (collecting cases). In contrast, mere ostracism or offensive utterance by co-workers does not qualify as an adverse employment action.

*Retherford v. Portland Pub. Schs.*, Case No. 3:18-cv-00401-JR, 2019 WL 7879880, at *14 (D. Or. Dec. 3, 2019).

"Whether a particular [action] is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 71 (2006) (quotation marks omitted). The plaintiff bears the burden of showing how a reasonable employee would have found each of the challenged actions materially adverse. *Id.* at 68.

### 2.    Legitimate, Nondiscriminatory Reason

"Once a *prima facie* case has been made, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action. This burden is one of production, not persuasion and involves no credibility assessment." *Opara*, 57 F.4th at 723 (simplified).

### 3.    Pretext

At the third step, a plaintiff can prove that the employer's proffered explanation is pretext either "(1) directly, by showing that unlawful discrimination more likely than not motivated the employers; [or] (2) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable; or via a combination of these two kinds of evidence." *Opara*, 57 F.4th at 723 (simplified). Although "very little evidence is necessary to raise a genuine issue of fact regarding an employer's motive," *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1124 (9th Cir. 2004) (simplified), when an employer provides "abundant and uncontroverted independent evidence" to suggest discrimination did not occur, a "plaintiff's creation of only a weak issue of fact as to whether the employer's reason was untrue will not suffice." *Opara*, 57 F.4th at 724 (quoting *Reeves v. Sanderson Plumbing Prods.,*

*Inc.*, 530 U.S. 133, 148 (2000)). The plaintiff retains the ultimate burden of persuasion that "an

employer's contested action was 'due in part or [in] whole to discriminatory intent.'" *Opara*, 57

F.4th at 724 (quoting *McGinest*, 360 F.3d at 1123).

**B.**     ***Analysis of Discriminatory Motive***

Applying the above standards, Menchu's discrimination and retaliation claims fail.

Menchu does not provide any direct evidence of discriminatory motive, nor does he create an

inference of discriminatory motive under the *McDonnell Douglas* framework.

**1.        Direct Evidence of Discriminatory Motive**

The court first considers whether Menchu has provided any direct evidence of

discrimination. "Direct evidence [of discrimination] is evidence which, if believed, proves the

fact of discriminatory animus without inference or presumption." *Coghlan v. Am. Seafoods Co.*,

413 F.3d 1090, 1095 (9th Cir. 2005) (quotation marks and brackets omitted). "Direct evidence

typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the

employer." *Id.*

In his Response, Menchu argues that he suffered "direct discrimination" when he was

told not to linger or visit with staff, when he was required to become certified to work as an

interpreter, when the Department allowed its bilingual staff to perform interpreter duties, and

when the Department failed to hire him as a fulltime employee. (Pl.'s Resp. at 16-41.) He also

points out that his supervisor, Gabriela Mora, testified in deposition that she rarely interacted

with Menchu, and that, as an on-call employee, Menchu was at the lowest level of the County's

employees. (Pl.'s Resp. at 18 (citing Mora Dep. at 15:25-17:04, ECF No. 100 at 53-63).) None of

those statements or actions, accepted as true, concern on their face anything to do with Menchu's

national origin, race, or ethnicity. Menchu's proffered direct evidence does not prove the fact of discriminatory animus.

### 2.    *McDonnell Douglas* **Framework**

Because there is no direct evidence of discriminatory intent, the court assesses whether Menchu creates an inference of discriminatory motive under the *McDonnell Douglas* framework.

The Department does not dispute that Menchu is a member of a protected class, is qualified for his position, or has performed his job satisfactorily. But the Department contends that Menchu fails to satisfy the *McDonnell Douglas* framework for his disparate treatment or retaliation claims, for four reasons. First, it argues that some of the alleged adverse employment actions never happened. (Def.'s Mot. at 12-15, 17.) Second, it says that other contested actions do not qualify as "adverse employment actions." (*Id.* at 12-17.) Third, it points out that Menchu was treated the same as all similarly situated employees. (*Id.* at 13-19.) Finally, even if Menchu can make a *prima facie* case, the Department offers nondiscriminatory, nonretaliatory reasons for actions that it took. (*Id.* at 12-15, 17.) The court considers each alleged adverse employment action in turn.

*Access to Non-Public Clinic Areas (Claim 1).* Menchu contends that the Department discriminated against him by denying him privileges enjoyed by clinic employees. Menchu, as an on-call interpreter, did not have badge access to non-public areas in the clinics, such as break areas and patient rooms. (Compl. ¶ 18; Menchu Dep. at 78:17-80:15, 103:22-105:06; Mora Decl. ¶ 16.) When necessary to perform his job, Menchu was escorted to patient rooms or other non-public areas by clinic employees. (Menchu Dep. at 79:25-80:03; Mora Decl. ¶ 16; Pl.'s Resp. at 16-18.)

Assuming that the lack of badge access was an adverse employment action, Menchu fails to make a *prima facie* case under *McDonnell Douglas* because he provides no evidence that similarly situated individuals outside his protected class were granted access that he was not. It is undisputed that no interpreter, regardless of race or national origin, had badge access to the locked areas of the clinics. (Mora Decl. ¶ 16; Pl.'s Resp. at 18.) Further, there is no evidence that *any* employee who worked across multiple clinics had badge access to each clinic where they worked. Menchu asserts "Other people who did not work for [the Department], including a Caucasian CareOregon employee (not a County employee), had free access to the back office and fax." (Pl.'s Resp. at 19.) Menchu supports that assertion by citing to Exhibit 31 to his Response. That exhibit includes a complaint that Menchu filed with Multnomah County, where he likewise asserted that there was a white CareOregon employee who had access to the back area of the clinic. (ECF No. 89-1 at 316.) But that Exhibit also indicates that, unlike Menchu, who worked across at least five clinics (Menchu Dep. at 82:5-10, 111:13-112:02), the CareOregon employee's primary work location was the clinic where she had badge access. (*Id.* at 323.) Menchu does not contend that the white CareOregon employee worked across multiple clinics or that she had badge access in other clinics. (*See* Pl.'s Resp.) The woman therefore does not provide a useful comparator. *See Ballou v. McElvain*, 29 F.4th 413, 423 (9th Cir. 2022) ("To establish similarity under the *McDonnell Douglas* framework, the individuals being compared [must be] similar in all material respects."); *Vasquez v. County of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003) ("[I]ndividuals are similarly situated when they have similar jobs and display similar conduct.").

*Exclusion from Meetings, Trainings, and Social Gatherings (Claim 1).* Menchu asserts that the Department discriminated against him by excluding him from meetings, trainings, and social gatherings. The only specific training or meeting that Menchu alleges he was excluded from was a COVID-19 training in March 2020. (Compl. ¶ 43; Pl.'s Resp. at 56.) To support that contention, Menchu points to an email showing he *did* receive an invitation to a March 2020 COVID-19 meeting before it happened. (Pl.'s Resp. at 56 (citing ECF No. 89-1 at 1226).) That email does not create a genuine issue of fact that Menchu was ever excluded from a COVID-19 meeting or training.

More broadly, Menchu contends that the clinics had many meetings, and that the clinics discriminated against him by failing to invite him to those meetings. (*See* Pl.'s Resp. at 13; Menchu Dep. at 82:19-83:03.) But exclusion from meetings or trainings is only an adverse employment action when those meetings or trainings are relevant to the employee's job, particularly where attendance would likely affect the employee's professional advancement. *Strother v. S. Cal. Permanente Med. Grp.*, 79 F.3d 859, 869 (9th Cir. 1996). Menchu neither provides a description of the many meetings or trainings that he alleges he was excluded from, nor how his exclusion from those meetings and trainings affected the terms of his employment. Accordingly, he has not provided evidence to allow a reasonable factfinder to conclude that exclusion from meetings and trainings constituted adverse employment actions.

Menchu also alleges that he was discriminated against when he was not invited to social gatherings, such as baby showers and birthday parties, held at the individual clinics. (Compl. ¶ 18; Pl.'s Resp. at 13.) But Menchu has provided no evidence suggesting that attendance at clinic social gatherings might have improved his employment status or chances of promotion.

Absent any such evidence, Menchu cannot show that his exclusion from social gatherings was an adverse employment action. *Strother*, 79 F.3d at 869 ("Mere ostracism in the workplace is not enough to show an adverse employment [action]."); *see also Blount v. Morgan Stanley Smith Barney LLC*, 982 F. Supp. 2d 1077, 1083 (N.D. Cal. 2013) (holding that supervisor's failure to invite plaintiff to lunches with other employees was not an adverse employment action absent evidence that plaintiff's "compensation or business acumen would have improved as a result of attending the[] lunches").

*Extra Duties and Cancelled Appointment (Claim 1).* According to Menchu, the Department discriminated by requiring him to perform extra duties, such as making reminder calls to patients, and by cancelling appointments and refusing to pay Menchu for the cancelled appointments. (Compl. ¶¶ 19, 21.) Menchu does not make out a *prima facie* case as to those actions under *McDonnell Douglas* because he does not contend, or provide evidence suggesting, that the Department treated any similarly situated individual more favorably.

*Public Reprimands (Claim 1).* Menchu alleges that the Department discriminated against him when Department employees publicly reprimanded him for failing to notify the clinic of a patient's presence, despite that Menchu had no responsibility for doing so. (Compl. ¶ 20; *see also* Pl.'s Resp. at 15.) "A verbal reprimand that has no effect on a plaintiff's job duties and was not placed in plaintiff's personnel file does not rise to the level of an adverse employment action." *Mendoza v. DeJoy*, Case No. 21-cv-00991-H-JLB, 2022 WL 18832234, at *7 (S.D. Cal. Dec. 20, 2022) (citing *Hardage v. CBS Broad., Inc.*, 427 F.3d 1177, 1189 (9th Cir. 2005) (Snide remarks are insufficient to constitute an adverse employment action.) *and Bollinger v. Thawley*, 304 F. App'x 612, 614 (9th Cir. 2008) ("Mere harsh words or threats are insufficient to

constitute an actionable adverse employment action" in the retaliation context.)); *accord. Nunez v. City of Los Angeles*, 147 F.3d 867, 875 (9th Cir. 1998) (holding that employer's scolding and threatening of plaintiff's job was not an adverse employment action in retaliation context). Menchu provides no evidence suggesting that reprimands by clinic employees affected his employment status or were reflected in his personnel file. Because the reprimands did not alter Menchu's conditions of employment, they are not adverse employment actions in the discrimination context.

*Job Classification (Claim 1).* According to Menchu, the Department discriminated against him by hiring him into, and keeping him in, a position that was classified as a "temporary outside worker on-call." (Compl. ¶¶ 28, 33-34; Pl.'s Resp. at 26.) As a result of that classification, he received lower pay than "regular fulltime" employees and was not entitled to COLAs, merit raises, paid leave, or insurance coverage. (Pl.'s Resp. at 26, 29-30.) Menchu does not allege a *prima facie* case as to his classification because he does not demonstrate that the Department treated similarly situated individuals outside his protected class more favorably. It is undisputed that Department employees who are part of the union receive benefits that on-call interpreters do not. (Pl.'s Resp. at 26-27; ECF No. 89-1 at 675, 684-85.) Menchu acknowledges, however, that all interpreters were classified the same way, and denied the same benefits, regardless of their race, ethnicity, or national origin. (Pl.'s Resp. at 25-30.) Because Menchu does not provide evidence of similarly situated employees outside his protected class who were treated more favorably (*see* Pl.'s Resp. at 25-41), he has not made out a *prima facie* case of discrimination as to his job classification.

*2017 Reduction in Hours (Claim 1).* Menchu alleges that the Department discriminated against him when, in March 2017, "Menchu's hours were reduced, and defendant began utilizing its uncertified bilingual staff to interpret for non-English-speaking patients in violation of federal regulations." (Compl. ¶ 23.) The Department disputes that Menchu's hours were reduced in 2017. (Def.'s Mot. at 12.) Even if Menchu's hours were reduced in March 2017, Menchu does not contend that the staff members who took his hours (that is, were treated more favorably) were outside of his protected class. Instead, he testified in his deposition that the Department's bilingual staff were Hispanic, that he didn't know their national origins but that they had "different national origin[s]" besides the United States, and that they were of "different race[s]" besides white or Caucasian. (Menchu Dep. at 143:19-144:17, 149:10-15; *see also* ECF No. 89-1 at 520.) Menchu therefore fails to make a *prima facie* case of discrimination as to this action.

*Health Assistant 1 Position (Claims 1, 2, and 3).* In his Complaint, Menchu alleges that the Department either discriminated against him or retaliated against him by hiring someone else into the "Health Assistant 1" position in March 2018. (Compl. ¶ 27.) Menchu did not apply for that position (Menchu Dep. at 188:19-189:01), and he fails to identify the person who was hired, besides asserting that the person was unqualified. (Pl.'s Resp. at 25; ECF No. 89-1 at 573, 1169-71.) Accordingly, he fails to make a *prima facie* case that this action was based on racial or national origin discrimination. He also fails to make a prima face case of retaliation, because he does not allege that any of his protected activities led to the action. (*See* Compl. ¶ 27; Pl.'s Resp. at 25.) Instead, Menchu argues in his Response that the position itself was problematic because it did not require interpreter certification, despite that the role involved interpreting, among other duties. (Pl.'s Resp. at 25.)

*Paycheck Audit (Claims 1, 2, and 3).* Menchu contends that the County retaliated against him (and possibly discriminated against him) by auditing his paychecks and requiring him to refund overpayments in April 2019. (Compl. ¶ 39.) Assuming Menchu makes out a *prima facie* case of both retaliation and discrimination, Menchu's claims related to the paycheck audit fail because he does not show that the Department's proffered reason is pretextual. The County switched to a new payroll system in January 2019. (Murphy Decl. ¶ 6; Mora Dep. at 31:15-18.) After the switch, Menchu incorrectly coded his time as "Double Time" instead of "Overtime" on a number of occasions. (Murphy Decl. ¶ 7.) The incorrect time entries created a flag in the payroll system because on-call employees do not earn double time. (Smith Dep. 23:3-12, ECF No. 100 at 14-20; Murphy Decl. ¶ 7.) As a result, Menchu's paychecks were audited, and Department employees Brieshon D'Agostini and Debi Smith met with him in either April or May 2019 to explain the errors, and that he had been overpaid as a result. (Smith Dep. at 23:3-24.) Menchu makes no argument that the Department's asserted reason for the meeting and paycheck audit is untrue. (*See* Pl.'s Resp. at 48-53.)

*June 2019 Reduction in Hours (Claims 2 and 3).* Menchu alleges that the Department reduced his hours in June 2019 in retaliation for his filing an unfair labor complaint in November 2018, filing a BOLI complaint in March 2019, and obtaining counsel in April 2019. (Compl. ¶¶ 38, 40; Menchu Dep. at 225:14-227:12.) He points out that, in the April or May 2019 meeting, D'Agostini told him that he had been inputting his time incorrectly and had been overpaid. (Menchu Dep. at 225:03-08; Smith Dep. at 23:18-22, 25:13-15; D'Agostini Dep. at 38:7-40:15.) At the meeting, Menchu was also told that he was working excessive hours for an on-call employee. (D'Agostini Dep. at 36:06-22; Pl.'s Resp. at 51.)

The Department does not contest that Menchu engaged in protected activities in November 2018, February 2019, and April 2019. The Department does, however, disagree that there was any reduction in Menchu's hours, pointing out that Menchu "worked well over the recommended 20 hours per week maximum for on-call employees." (Def.'s Mot. at 12.) Although it is undisputed that Menchu worked more than 20 hours per week throughout 2019, that fact is consistent with Menchu's contention that his hours and assignments were *reduced* sometime in 2019. Indeed, Menchu's paystubs show that Menchu worked fewer hours and received lower pay in June 2019 than he had in the preceding five months. (*See* Bannon Moore Decl. Ex. 5 at 6-7, ECF No. 81.) Further, an employee of Language Services, who was tasked with scheduling interpreter appointments at the time, testified that she was instructed to reduce Menchu's hours around June 2019. (Hazeem Dep. at 17:16-18; Pl's Resp. at 49.) Menchu has provided sufficient evidence to allow a reasonable factfinder to conclude that his hours were reduced in June 2019. Even a small reduction in hours (and a corresponding reduction in pay) is an adverse employment action in the retaliation context because it is "reasonably likely to deter [employees] from engaging in protected activities." *Ray*, 217 F.3d at 1242-43 (holding that reduction in workload and pay were adverse employment actions).

To meet the third element of his *prima facie* case, Menchu must provide evidence that the adverse employment actions would not have occurred but for his protected activities. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). Menchu relies on timing to show that his protected activities were a but-for cause of his reduction in hours. (*See* Pl.'s Resp. at 51.) "Causation can be inferred from timing alone where an adverse employment action follows on

the heels of protected activity." *Villarimo v. Aloha Is. Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002).

But the record here undermines Menchu's use of timing to show that the reduction in hours resulted from his protected activities. Long before Menchu had filed the complaints alleged to have caused the retaliation, the Department had informed all interpreters that, because of budget constraints, they would be scheduled to only four assignments per day. (ECF No. 89-1 at 458.) After Menchu's protected activities and before his hours were reduced, the Department audited Menchu's paychecks because of his mistaken timekeeping entries. As a result, the payroll department reviewed Menchu's invoices, which showed his appointments and that his hours far exceeded 20 hours per week. (Mora Dep. at 28:16-29:08; Mora Decl. ¶ 13.) Given the undisputed evidence that Menchu's paychecks and invoices were reviewed shortly before the adverse employment action for reasons independent of Menchu's protected activities, together with Language Service's previously announced policy of limiting appointments for on-call interpreters, timing alone does not create an inference of causation here. *See, e.g.*, *Lee v. Eden Med. Ctr.*, 690 F. Supp. 2d 1011, 1026 (N.D. Cal. 2010) (holding that intervening event negated any inference that plaintiff's protected activity caused the subsequent adverse action); *Zsenyuk v. City of Carson*, 99 F. App'x 794, 796 (9th Cir. 2004) (temporal proximity argument undermined where alleged retaliatory conduct stemmed from investigation of conduct that occurred before protected activity).

*September 2019 removal from appointments (Claims 2 and 3)*. Menchu alleges that, by September 2019, the Department was reassigning Menchu's appointments to others. (Compl. ¶ 40.) But Menchu provides no evidence of his name being removed from appointments (*see*

Page 25 – FINDINGS AND RECOMMENDATION

Pl.'s Resp. at 48-56), and thus has not raised a genuine dispute of material fact that this action occurred.

*December 2019 Reduction in Assignments (Claims 2 and 3).* Menchu alleges that the Department began reducing his assignments effective December 10, 2019, after learning about his whistleblower complaint around December 5. (*Id.* at 56.) He directs the court to his Exhibit 73, which shows that, as of December 9, Menchu was only scheduled for two appointments on December 10. As the court has noted, it is undisputed that Menchu's hours and number of appointments varied from day to day and week to week. Although two appointments is fewer than Menchu usually had in a day, that Menchu was scheduled for fewer appointments than usual on a single day, without more, does not create a genuine dispute of material fact that Menchu's assignments were intentionally reduced in December 2019.

*Sick Leave (Claims 2 and 3).* Menchu alleges that the Department retaliated against him by denying him sick leave to which he was entitled. (Compl. ¶ 44.) Yet Menchu provides no other information about when he was denied sick leave or the circumstances of that denial. (*See id*; Pl.'s Resp.) Without more information, Menchu fails to make a *prima facie* case that any denial of sick leave was retaliatory.

*Failure to Hire into Fulltime Position (Claims 2 and 3).* Menchu alleges that the Department retaliated against him by failing to hire him into a fulltime position. (Compl. ¶¶ 35-37; Pl.'s Resp. at 48-51.) Following Menchu's complaints, the Department created the classification for a fulltime interpreter position. Once the classification was created, any clinic could hire a fulltime, "regular status" interpreter if it had the budget and need for the position. (Murphy Decl. ¶ 5.) However, no clinic has done so. (Def.'s Mot. at 7-8; Murphy Decl. ¶ 5.) The

Page 26 – FINDINGS AND RECOMMENDATION

Department contends that the clinics prefer to use vendors for interpretation, because doing so is easier and ensures that the Oregon Health Plan will cover interpretation for its patients. (Mora Decl. ¶¶ 8-10.) Menchu provides no argument or evidence to show that the Department's proffered reason is pretext for retaliation, and his based on this action therefore fails.

In sum, Menchu has failed to provide sufficient evidence to allow a reasonable factfinder to conclude that he experienced any adverse employment actions due in whole or in part to his race, national origin, or protected activities. Indeed, "abundant and uncontroverted independent evidence" suggests that no discrimination or retaliation occurred. *Opara*, 57 F.4th at 724. Accordingly, the Department's motion for summary judgment on Claims 1, 2, and 3 should be granted.

## C.      *Claim 4: Race Discrimination under Title VI*

Menchu also alleges that the Department violated Title VI by using federal funds for a discriminatory purpose. In relevant part, Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving Federal financial aid." 42 U.S.C. § 2000d. To state a race discrimination claim under Title VI, "a plaintiff must allege that (1) the entity involved is engaging in racial discrimination; and (2) the entity involved is receiving federal financial assistance." *Fobbs v. Holy Cross Health Sys. Corp.*, 29 F.3d 1439, 1447 (9th Cir. 1994), *overruled in part not relevant here by Daviton v. Columbia/HCA Healthcare Corp.*, 241 F.3d 1131 (9th Cir. 2001). "Private parties seeking judicial enforcement of Title VI's nondiscrimination protections must prove intentional

Page 27 – FINDINGS AND RECOMMENDATION

discrimination." *Yu v. Idaho State Univ.*, 15 F.4th 1236, 1242 (9th Cir. 2021) (citing *Alexander v. Sandoval*, 532 U.S. 275, 281 (2001)).

As explained in the analysis of Menchu's disparate treatment claim, Menchu has not provided evidence giving rise to an inference of intentional discrimination on the basis of race or national origin. And to the extent that Menchu argues in his Response that he is asserting a Title VI disparate treatment claim on behalf of the Department's patients (*see* Resp. at 8), who are intended beneficiaries under Title VI, Menchu lacks standing to make that claim. *See Fobbs*, 29 F.3d at 1448 (rejecting third-party standing argument on Title VI claim where plaintiff-doctor did not explain why he, rather than his patients, should receive money damages for injury inflicted on patients). The Department's motion for summary judgment on Claim 4 should be granted.

**D.    *New Claim Under 42 U.S.C. § 1985***

In his Response, Menchu asserts a claim under 42 U.S.C. § 1985(2). (Pl.'s Resp. at 66.) Menchu did not bring that claim, or factual allegations that would support the claim, in his amended complaint. "A response to summary judgment is not the time to amend pleadings or raise new claims." *Unigestion Holdings, S.A. v. UPM Tech., Inc.*, 580 F. Supp. 3d 932, 957 n.19 (D. Or. 2022). Menchu's § 1985 claim is not properly before the court, and the court therefore declines to address it. *See Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008) ("[O]ur precedents make clear that where, as here, the complaint does not include the necessary factual allegations to state a claim, raising such a claim in a summary judgment motion is insufficient to present the claim to the district court.").

\ \ \ \ \

**CONCLUSION**

For the above reasons, defendant's Motion for Summary Judgment (ECF No. 80) should be GRANTED.

**SCHEDULING ORDER**

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due within 14 days. If no objections are filed, the Findings and Recommendation will go under advisement on that date. If objections are filed, a response is due within 14 days. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED: August 16, 2024

_____
JEFF ARMISTEAD
United States Magistrate Judge